## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 08-14063-CR-MOORE/LYNCH

UNITED STATES OF AMERICA,

      Plaintiff,

v.

JOSE ANGEL GOMEZ-GOMEZ,

      Defendant.

_____/

FILED by _____ D.C.

JAN 2 0 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

### REPORT AND RECOMMENDATION ON
### DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED
### IN VIOLATION OF THE FOURTH AMENDMENT [D.E. #24]

**THIS CAUSE** having come on to be heard upon the aforementioned motion and this Court having reviewed the motion, the government's response and all other pleadings in this matter, and this Court having conducted an evidentiary hearing on January 16, 2009, at which time evidence and arguments of counsel were received, this Court recommends to the District Court as follows:

    1.    The government called Senior Border Patrol Agent Delgado as its sole witness in this case. Agent Delgado has recently been transferred to the Border Patrol Offices in Laredo, Texas. During the time when this case arose, he was working out of the West Palm Beach Office. He has eleven and one-half years experience with the Border Patrol. He testified as to his extensive training, service as a Field Training Officer, and service as an instructor at the various law enforcement academies. He estimates that he has been involved in thousands of immigration interdictions and hundreds of traffic stops involving immigration law violations. He also participates in continuing training since he has been with the Border Patrol. The Border Patrol also receives frequent intelligence updates concerning immigration issues and techniques being used by individuals attempting to violate the immigration laws of the United States.

2.     On or about October 30, 2008, Agent Delgado was called at his home concerning a citizen's report of a possible "load" of illegal aliens traveling southbound on I-95. This call was from a citizen who had previously provided reliable information concerning similar matters. Agent Delgado responded to the I-95 area at the Fort Pierce exit in St. Lucie County, Florida. He positioned his vehicle there to observe southbound traffic. He arrived at that location at approximately 1:30 a.m. Agent Dair was also called out on this same complaint.

3.     The vehicle which had been reported was never found. Since their designated shift had already begun around 6:00 a.m., Agent Delgado stayed in his marked vehicle. Agent Dair was also in a marked Border Patrol vehicle and stayed out to monitor traffic. Shortly thereafter, Agent Dair radioed to Agent Delgado that he had seen a green Dodge Caravan minivan which he believed was riding low and had a Delaware temporary license tag. This was at approximately 6:30 a.m. and it was still dark out according to Agent Delgado. Agent Dair requested Agent Delgado to take a look at the van. Agent Dair purportedly told Agent Delgado that the minivan had tinted windows and that he could not read the license plate because of the glare off of the plastic cover over the temporary tag. He was able to determine that it was a Delaware tag though.

4.     Agent Delgado then positioned himself near the Fort Pierce exit on I-95 southbound. He positioned his vehicle at a slight angle on the side of the road so that he could view traffic as it came towards him. He observed the green minivan in question approach him. As it passed by he could see the passenger appeared to be an Hispanic male.

5.     Agent Delgado testified that later, Agent Dair told him that the van had reduced speed from 70 miles an hour to 55 miles an hour on the Interstate shortly after Agent Dair began following it. The vehicle also moved from the center lane over to the

2

righthand lane. Agent Delgado testified that Border Patrol agents are trained to observe this type of behavior to possibly be a nervous reaction by someone who may be violating immigration laws once they see a marked Border Patrol vehicle. It has also been Agent Delgado's experience that vehicles that are violating immigration laws may pull to the righthand side of the highway to prepare to pull to the shoulder and have everyone "bail out" of the vehicle and run. He testified that he has had this happen to him on various occasions. Agent Dair did not want to make a traffic stop until Agent Delgado could catch up and act as a backup for him.

6.      Agent Delgado testified that vans and minivans are routinely used to transport "maximum loads" of illegal aliens to maximum the profits of those individuals who are smuggling illegal aliens. This will sometimes cause the vans to ride low because either the vans are in poor condition with bad shocks or the passenger capacity in the van is overloaded. Agent Delgado testified that this is based upon both his personal experience as a Border Patrol agent and intelligence information he has received over the years in respect to his duties.

7.      He testified that the Delaware temporary tag was a significant factor as well because Border Patrol has received information that illegal alien smugglers are utilizing license plates from east coast states to throw off or divert attention of Border Patrol agents who are looking for license plates from the southwest states such as California, New Mexico, Arizona or Texas. This Court has heard this testimony previously in a particular case which this Court will refer to later in its analysis. Agent Delgado testified that Border Patrol has also learned that vehicles from the southwest part of the United States may even come to Georgia, Florida, or another east coast state, change vehicles into a vehicle with an east coast license tag and then complete their travel into South Florida. In this

3

fashion, the alien smugglers are attempting to blend in and not be an obvious vehicle from the southwest state which has a contiguous border with Mexico.

8.    Agent Delgado testified that the fact that there was a temporary plate is also significant because it indicates that the vehicle was recently purchased. Once again, his experience and Border Patrol intelligence information has revealed that alien smugglers routinely use vehicles which are purchased for very small amounts of money from tow yards/junk yards. These vehicles are not well maintained and if they are seized, do not cause the smugglers a significant financial loss. The temporary tag would indicate that the vehicle was recently purchased.

9.    In this case, neither Agent Delgado nor Agent Dair were able to read the plate specifically to report the number to their dispatcher for a registration check. Nevertheless, the temporary tag was a factor that Agent Delgado considered and communicated to Agent Dair before a decision was made to stop this vehicle.

10.    Additionally, Agent Delgado testified that based upon his training, experience and intelligence information received from Border Patrol, that I-95 has been known for quite some time as a major north-south route for alien smugglers. On cross-examination it was brought out that I-95 is a main north-south route for all types of traffic since it runs all the way from Dade County up to the State of Maine. However, the placement of the vehicle traveling on I-95, along with other factors that this Court will discuss, were being considered by Agent Delgado and Agent Dair together before an immigration stop was initiated.

11.    Agent Delgado testified that he was at milepost 116 which is near Gatlin Boulevard in Port St. Lucie, Florida, when he was positioned waiting for the green van to come his way. He estimated that Agent Dair had followed the van for approximately ten miles from the first time that he saw it until the immigration stop was eventually made. Of

4

that distance, Agent Delgado testified that he followed the vehicle for the last three miles before the stop.

12. He testified that the passenger being Hispanic was a significant factor that he considered. His training and experience as well as information received by Border Patrol has shown that alien smugglers very often use Hispanic individuals to control and communicate with the aliens being smuggled since most of them usually do not speak English. When asked on cross-examination what he considers to be an Hispanic person, Agent Delgado responded that he looks for someone who looks like himself. Agent Delgado testified that he is Hispanic and was raised in Texas near the Mexican border. He testified that he is of Mexican heritage and descent. He said individuals who have his facial features and darker skin such as he has are initially looked at by him to possibly be of Hispanic descent.

13. Another factor that Agent Delgado considered was heavily tinted windows on the side passenger windows on either side of the van. The front driver's window and front passenger window were not heavily tinted. This heavy tint is another factor which training and experience has indicated alien smugglers use to prevent law enforcement from easily looking into the van to see how many individuals are inside and possibly what their nationality is.

14. While following the vehicle, Agent Delgado was able to look through the rear window which had a little less tint on it according to his testimony. He could not see clearly through the rear window, but he could see multiple individuals inside moving about. He testified that their movements combined with the fact that the vehicle had pulled to the righthand lane raised his suspicions that the vehicle may be getting ready to pull off to the side of the road and have everyone "bail out" as he previously testified. He also confirmed

5

that the vehicle appeared to be riding lower than it normally would be for a minivan of this type.

15.     Agent Delgado testified that he had communicated his observations to Agent Dair and they communicated back and forth on the radio before making the decision to stop the vehicle. Agent Dair was the agent in charge of this immigration stop and Agent Delgado was assisting.

16.     After the vehicle was pulled over, Agent Delgado walked up to the driver's window and asked the driver in English to turn off the vehicle. The driver could not understand him, so then Agent Delgado asked him to perform the same task in Spanish. The driver complied. Agent Delgado identified the Defendant in court as the person who was driving the van. There were five passengers in the van in addition to the Defendant who was driving.

17.     The Defendant told Agent Delgado that he was from Mexico and illegally in the United States. He said all of the passengers were illegal aliens as well. In speaking to the passengers, they also admitted that they were illegally in the United States. The communication with the Defendant and the passengers was in Spanish by Agent Delgado.

18.     The Defendant told Agent Delgado that this group of individuals had recently purchased this vehicle in New Jersey for $900 from a tow company. When asked about the Delaware tag for a vehicle bought in New Jersey, the Defendant said that someone that they knew had given them the tag.

19.     On cross-examination, counsel for the Defendant pointed out that Agent Dair's affidavit submitted in support of the original Complaint in this case indicates that Agent Delgado was the one who first saw and reported the vehicle riding low. Agent Delgado read the affidavit presented to him by defense counsel on the witness stand. He then testified that he may have gotten things "a little mixed up" concerning that issue.

6

Nevertheless, he reiterated that he did see the van riding low and that he had communicated this and discussed this with Agent Dair before the stop.

20.     On cross-examination, it was established that prior to Agent Delgado following the vehicle, that Agent Dair observed the Defendant pull into the righthand lane and significantly reduce his speed. While it is not unlawful to travel I-95 at 55 miles an hour as opposed to the 70 miles an hour that the vehicle was previously traveling, it was a significant factor which was communicated to Agent Delgado and considered by Agent Dair prior to the stop. This reduction in speed occurred only after Agent Dair in his marked vehicle began following the Defendant's vehicle. While traveling in the righthand lane, it was established on cross-examination that the Defendant actually pulled back into the center lane, passed another vehicle, and then pulled back into the righthand lane.

21.     The Defendant presented no witnesses or evidence at the hearing.

## ANALYSIS

22.     This Court must consider the totality of all the circumstances and the factors within the knowledge of the Border Patrol agents as they observe them on the day in question. This Court must also take into consideration the agents' training, experience and intelligence information that they receive from their Border Patrol offices. United States v. Arvizu, 122 S.Ct. 744 (2002).

23.     Agent Delgado testified to extensive training and experience which he has gained over the last eleven and one-half years as a Border Patrol agent. He has also served as an instructor in various law enforcement academies. He has had extensive training and experience on the job. His agency provides intelligence updates on new techniques being utilized by individuals attempting to violate the immigration laws of the United States. Further, this Court takes into consideration the fact that Agent Delgado is

Hispanic and testified that he was raised in Texas in an Hispanic household. This is significant since one of the factors utilized by Agent Delgado in deciding whether to make an immigration stop is based upon the nationality of the individuals in the vehicle.

24.     As the Supreme Court stated in Arvizu, reasonable suspicion justifying an investigatory stop need not rule out the possibility of innocent conduct. However, the observations of certain factors by the agents prior to make such a stop must within their totality justify a reasonable probability that criminal conduct is afoot. This Court finds that this case is significantly different and contains many more specific factors than the case of United States of America v. Winter-Suarez and Cruz-Rivas, Case No. 08-14064-CR-GRAHAM/LYNCH, in which this Court heard a Motion To Suppress the day prior to the Motion To Suppress hearing in this case. In this case, there are significant factors which, taken individually, may not raise any suspicion of illegal conduct on the part of the Defendant and occupants of the van. However, to a trained law enforcement officer, such as Agent Delgado, these numerous factors did raise a reasonable suspicion in his mind that the individuals in the vehicle may be illegal aliens violating the immigration laws. This Court will compare the factors in this case with other cases that it has ruled upon as well as other appellate decisions which are deemed significant.

25.     In the case of United States v. Juan Jose-Andres, Case No. 08-14045-CR-GRAHAM/LYNCH, this Court conducted an evidentiary hearing in respect to the Defendant's Motion To Suppress. Agent Delgado was also the agent in that case who made the immigration stop. This Court found that the factors observed by Agent Delgado were sufficient under the applicable case law to justify an immigration stop of the vehicle in question. Accordingly, this Court recommended that the Motion To Suppress in that case be denied. This Court finds that the factors in that case were similar to the factors observed by Agent Delgado in this case.

8

26.     In the Jose-Andres case, the testimony from Agent Delgado revealed the following:

a.      An Hispanic driver who was observed to at first be calm and then visibly stiff, rigid, and sat up straight when the driver and his front seat passengers observed the marked Border Patrol vehicles alongside I-95;

b.      Neither the driver nor the front seat passengers looked over at the marked Border Patrol vehicles as they passed;

c.      There were two front seat passengers in addition to the driver in the minivan which Agent Delgado felt was unusual because he believed minivans to have only two seats, i.e., one for the driver and one for the front seat passenger, which would indicate that there were numerous other individuals in the back of the minivan;

d.      There was an Alabama license plate on that vehicle and Agent Delgado testified that intelligence from the Border Patrol was that alien smugglers were now using vehicles licensed in "states along the east coast of the United States" to throw off law enforcement looking for vehicles with plates from the southwest United States area such as California, Arizona and Texas, which have adjacent borders with Mexico;

e.      The rear window of that minivan in that case was tinted and Agent Delgado could see silhouettes of several people moving about as if "crouching down to avoid detection";

f.      While driving next to and parallel with the minivan, neither the driver nor any of the passengers turned their heads;

g.      The driver was visibly gripping the steering wheel "very tightly"; and

h.      Agent Delgado observed while riding behind the vehicle that the rear tires were bulging and the vehicle was riding very low to the ground which led him to

believe that it was carrying a heavy load with as many people as possible "crammed into it" to the point of being overloaded.

27.    There is no litany nor established list of factors which are exclusively to be considered in cases such as this. The Supreme Court in Arvizu specifically stated that it was deliberately avoiding the creation of some list of specific factors which would serve to justify an investigatory stop in a factual situation such as we have before us.  Each case is to be decided upon its own facts combined with the experience and training of the agents in question.  In this case, the testimony of Agent Delgado reflects the following factors were within his and/or Agent Dair's framework of knowledge before a decision was made to conduct an investigatory stop:

      a.    Hispanic passenger in the front seat of the minivan;

      b.    Minivans are sometimes used to smuggle illegal aliens;

      c.    Vehicle registered in the State of Delaware with a temporary plate which experience has shown in the past indicates a vehicle recently purchased as alien smugglers often do;

      d.    The observations were in the early morning hours on I-95 which is known to be a main traffic corridor for alien smugglers as well as lawful citizens;

      e.    The minivan was observed riding low in the back indicating either poorly maintained condition such as one bought cheaply by alien smugglers and/or overloaded beyond its normal passenger capacity which would indicate possible alien smuggling as well;

      f.    The drastic reduction in speed only after the marked Border Patrol vehicle of Agent Dair began following the vehicle;

      g.    The pulling over to the righthand lane from the center lane after Agent Dair began following the vehicle, which raised suspicions concerning the vehicle may be

preparing to pull off the highway so that the occupants could "bail out" to avoid apprehension;

h.     Silhouettes of several people seen through the back of the minivan moving about consistent with what Agent Delgado has observed in the past when individuals are readying themselves to "bail out" of a vehicle after it immediately pulls off to the side of the road; and

i.     Heavily tinted windows on the side which experience has shown Border Patrol agents is sometimes used by alien smugglers to prevent agents riding adjacent to the vehicles from being able to see into the vehicle and determine the nationality and number of passengers.

28.     Counsel for the Defendant refers to United States v. Smith, 799 F.2d 704 (11th Cir. 1986) to support his argument that a pretextual traffic stop based solely upon minimal observations by a state trooper following a vehicle for only a mile and a half during which he purportedly observed weaving, was insufficient reason to justify a traffic stop. This Court has reviewed the Smith case, and finds that the factors in that case were not nearly as extensive as this case. In the Smith case, the trooper only followed the vehicle for a mile and a half. He was utilizing a drug courier profile and was found to have conducted a "pretextual" stop of the vehicle in question after saying that he had observed some "weaving" to justify the stop. Those factors are minimal at best as compared to the factual situation this Court has before it.

29.     The Eleventh Circuit later in Riley v. City of Montgomery, Alabama, 104 F.3d 1247 (11th Cir. 1997), admitted that its previous standard for determining a traffic stop was "pretextual" as set forth in the Smith case, had been rejected by the United States Supreme Court in Whren v. United States, 517 U.S. 806 (1996). Now, as indicated by the Eleventh Circuit in Riley, the appropriate approach in determining the reasonableness of

11

a traffic stop is determined irrespective of the intent of the individual officer involved. Rather, it is whether or not the factors observed by the officer raised a reasonable suspicion in that officer's mind to justify such an investigatory stop. In short, the Smith case cited by the Defendant is found distinguishable from the facts before this Court at this time.

30.     In United States v. Cruz-Hernandez, 62 F.3d 1353 (11th Cir. 1995), there was was a roving Border Patrol stop of a van. This Court notes that the Cruz-Hernandez case originated from this Division of this Court. The Eleventh Circuit found that failure to make eye contact cannot be considered alone in determining whether a Border Patrol agent had reasonable suspicion to stop the defendant to verify his citizenship status. The Hispanic driver, who had quickly averted his gaze when an agent looked at him and who appeared nervous, was only one factor to be considered. In Cruz-Hernandez, the court found that there was reasonable suspicion to stop a van.

31.     In Cruz-Hernandez, the court found that Florida is not in an area which shares any land border with a foreign country. Therefore, the vehicle's proximity to a land border was much less significant for consideration. The court found that a combination of factors such as the characteristics of the area in relation to its proximity to the border, unusual traffic patterns on the road, previous experience with alien smuggling in the area, behavior of the driver such as erratic driving, characteristics of the vehicle such as being heavily loaded, and other factors can be considered by the agent in light of his experience in detecting illegal entry and smuggling such to justify an immigration stop. Once again, the Cruz-Hernandez court cited to the totality of the particular circumstances standard.

32.     In particular, the agent in Cruz-Hernandez observed the following:

a.     The defendant was dressed in clothes typical of undocumented aliens working in the local fields;

12

b.     The defendant quickly averted his gaze and jerked his head to the front when the agent looked at him and seemed nervous;

c.     The defendant appeared to be Hispanic;

d.     The defendant was driving a van typical of those to transport large numbers of undocumented aliens to and from the fields;

e.     The vehicle displayed an out-of-state plate;

f.     The agent knew that many undocumented aliens lived in the local trailer park "near the location" of the stop; and

g.     Local businesses and citizens had complained of undocumented aliens living in the area and working in the area fields.

33.    Many of the factors present in the Cruz-Hernandez case referenced above are also present from the testimony of Agent Delgado in this case. This Court notes that these factors have been considered by the Eleventh Circuit to serve as a sufficient and reasonable basis for an investigatory stop. The factors in this case before the Court are also more extensive and detailed than the minimal factors in United States v. Tapia, 912 F.2d 1367 (11th Cir. 1990), which this Court has cited previously for comparison purposes in its Report and Recommendation in the Winter-Suarez and Cruz-Rivas case. In Tapia, all that was observed was a driver to be of Mexican descent who appeared to be visibly nervous and who had only a few pieces of luggage in his vehicle. This was found to not be sufficient evidence to raise a reasonable suspicion to justify an investigatory stop. When comparing the factors in Tapia with the factors in this case, one can readily see that the observations and factors considered by Agent Delgado and Agent Dair in this matter are much more detailed, extensive and would cause reasonable suspicion sufficient to justify an investigatory stop of the Defendant's vehicle.

13

34.      The government cites to <u>United States v. Guerrero-Barajas</u>, 240 F.3d 428 (5th Cir. 2001), in support of its position in this case. The Fifth Circuit found that the Border Patrol agents did have reasonable suspicion sufficient to conduct an investigatory stop based upon their observations of the following activity:

a.      That the highway being traveled was a common route and area for alien smuggling approximately 35 miles north of the Mexican border;

b.      The stop was at 12:30 a.m. and it was the training and experience of the officers in question that "lawful vehicles" infrequently traveled in that area at that time of day;

c.      Other investigatory stops of "low riding vehicles resulted in the seizure of illegal aliens";

d.      The vehicle in question was riding low with windows "heavily tinted"; and

e.      The driver was observed driving slow and began to swerve in his lane once the agents began to follow him.

35.      The factors referenced by the Fifth Circuit in <u>Guerrero-Barajas</u> are very similar to the facts before this Court at the present time. Those factors were deemed to be sufficient to raise reasonable suspicion to justify an investigatory immigration stop.

36.      In summary, the observations and factors considered by Agent Delgado and Agent Dair are found by this Court to be sufficient to justify an investigatory stop. This Court will not restate those factors which it listed specifically herein. When all of these factors taken in their totality and combined with the training/experience of Agent Delgado, it is this Court's finding that they are sufficiently detailed and specific to raise a reasonable suspicion that criminal conduct was afoot. Therefore, the investigatory immigration stop was justifiable.

14

**ACCORDINGLY**, this Court recommends to the District Court that the Motion To Suppress [D.E. #24] be **DENIED**.

The parties shall have ten (10) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable K. Michael Moore, United States District Judge assigned to this case.

**DONE AND SUBMITTED** this 20th day of January, 2009, at Ft. Pierce, Northern Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

cc:
Hon. K. Michael Moore
AUSA Jennifer Millien
AFPD Fletcher Peacock